MATTER OF C—

In DEPORTATION Proceedings

A-12143440

*Decided by Board January 2, 1962*

Deportability—Sections 241(a)(4) and 241(b) of 1952 Act—Effect of U.S. citizenship at time of conviction—Retroactive effect of denaturalization—Single scheme issue—Inference that crimes are unrelated when committed a year apart.

(1) Respondent entered the United States as an alien in 1895, was naturalized as a United States citizen in 1925, reentered the United States in 1948, was convicted in 1954 of two counts of federal income tax evasion, and was denaturalized in 1959. Held: respondent is deportable under section 241 (a)(4) of the Act as an alien who after entry (in 1895) has been convicted of two crimes involving moral turpitude not arising out of a single scheme of criminal misconduct.

(2) No defense to deportability lies in contention that respondent was a United States citizen rather than an alien on the date of his conviction in 1954. Section 241(a)(4) of the Act does not require that the offender must have had the status of an alien at the time of his conviction.

(3) No bar to deportability found in the fact that because respondent was convicted while he was a citizen he may have been deprived of access to the provisions of section 241(b) of the Act permitting a court to make a recommendation against deportation within 30 days after passing sentence.

(4) In view of the retroactive effect of a denaturalization decree under section 340(a) of the Act, the "relation-back" doctrine may properly be invoked so that for the purposes of section 241(a)(4) respondent can be considered as having been an alien at the time of his conviction.

(5) Where respondent was convicted in a single trial for filing a fraudulent tax return on January 14, 1949 for the calendar year 1948, and on another count for filing a fraudulent tax return on March 10, 1950 for the calendar year 1949, and where he refused to testify at the deportation hearing and did not offer probative evidence bearing on the issue, held: the normal inference that crimes are not related when committed a year apart has not been controverted, and the government has met its burden of proving that the two offenses did not arise out of a single scheme of criminal misconduct.

CHARGES:

Order: Act of 1952—Section 241(a)(4) [8 U.S.C. 1251(a)(4)]—Convicted of two crimes after entry (tax evasion 1954; tax evasion 1954; contempt of Congress 1952).

Act of 1952—Section 241(a)(4) [8 U.S.C. 1251(a)(4)]—Convicted of crime committed within five years of 1948 entry (tax evasion

524

committed 1949; tax evasion committed 1950; contempt of Congress committed 1951).

Act of 1952—Section 241(a)(4) [8 U.S.C. 1251(a)(4)]—Convicted of two crimes after entry (tax evasion 1954; tax evasion 1954; contempt of Congress 1952; contempt of court 1957).

## BEFORE THE BOARD

**DISCUSSION:** This is an appeal from the order of the special inquiry officer requiring the respondent's deportation on the first charge set forth above on the basis of the convictions in 1954 for tax evasion. The appeal will be dismissed.

The respondent, a 70-year-old married male, a native of Italy, concedes that he is an alien. These events are relevant. The respondent entered as an alien in 1895. He was naturalized in 1925. He returned from Mexico to the United States in 1948. He has the following convictions: contempt of Congress in 1952, tax evasion in 1954 (two counts), and contempt of court in 1957. His naturalization was revoked in 1959.

Deportation on the first charge is sought under that portion of section 241(a)(4) of the Immigration and Nationality Act (8 U.S.C. 1251(a)(4)) which provides:

(a) Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who—

(4) * * * at any time after entry is convicted of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial.

Deportation was ordered on the basis of the tax convictions. The issues are whether these convictions, to constitute grounds for deportation, had to occur while the respondent was an alien, whether the convictions were for crimes involving moral turpitude, and whether they arose out of a single scheme.

### The Tax Convictions and Alienage

This discussion is concerned with one who is an alien but who in the past was a citizen and while a citizen was convicted of crime.

We believe that the precedents hold that if the condition which is basis for deportation (e.g., conviction of crimes) is one which could occur to either an alien or a citizen, then the nationality status of the individual at the time the condition arose is immaterial. We believe that the basis for deportation here is a condition which could have occurred to either an alien or a citizen. We conclude that the nationality status of the respondent at that time was immaterial. The precedents fall into two categories. In the first are the cases decided on the basis of the fact that the ground of deportation is related to the making of an entry and that by definition

525

only an alien can make an entry; therefore, a person who was not an alien at the time he came to the United States, had not made an entry and there was no need to consider whether he had to be an alien later when the deportable ground arose. If, however, the individual was an alien at the time of entry or if alienage at the time of entry is not a factor because the ground of deportation is not related to an entry, the issue as to the necessity of the coexistence of alienage and the occurrence of the ground of deportation requires decision, but no defined term dictates the answer.[1]

In the situation before us, alienage at the time of entry in 1895 is conceded.[2] The situation before us is one concerned not with alienage and entry but with the coexistence of alienage and the emergence of the ground of deportation. Before we consider this group of cases we shall consider the group which concerned entry since counsel relies upon such cases. The cases concerned with alienage at the time of entry are *Barber* v. *Gonzales*, 347 U.S. 637 (1954), and *United States ex rel. Brancato* v. *Lehmann*, 239 F.2d 663 (C.A. 6, 1956). Gonzales, a native of the Philippines, was a national of the United States from the time of his birth until 1946 when he became an alien. He resided in the United States continuously from the time of his admission in 1930. Convicted of crimes in 1941 and in 1950, he was ordered deported in 1951 under that portion of section 19(a) of the Immigration Act of 1917 (39 Stat. 889, as amended, formerly 8 U.S.C. 155(a)) which called for the deportation of an alien "who is hereafter [May 1, 1917] sentenced more than once * * * because of conviction in this country of any crime involving moral turpitude, committed at any time after entry." An entry can be made only by an alien who has voluntarily come from a foreign port. Gonzales contended that he had made no entry for he had come neither as an alien nor from a foreign port; he had come as a national from an insular possession to the mainland. The Service contended that he should be considered as if he had been an alien coming from a foreign port, because from 1934 to 1946 the law provided that for the purpose of the immigration laws Filipinos were "considered as if they were aliens." The Court ruled that Gonzales was not deportable. The Court held that until 1934 the Philippines could not be regarded as foreign; that Gonzales had not arrived from foreign; and that there was, therefore, no entry. The

---

[1] In addition to grounds of deportation where alienage is required because an entry is involved is the ground which by its nature can be met only by one who is an alien (*e.g.*, failure to register as an alien, failure to maintain status as nonimmigrant (sections 241(a)(5) and (9) of the Act, 8 U.S.C. 1251)), but we are not concerned with such a ground.

[2] It is proper to use the first entry (*Banez* v. *Boyd*, 236 F.2d 934 (C.A. 9, 1956); *United States ex rel. Belfrage* v. *Kenton*, 131 F. Supp. 576, affd. 224 F.2d 803 (C.A. 2, 1955)).

Court would not consider Gonzales as if he had made an entry as an alien. This disposition of the case made it unnecessary for the Court to rule on the contention that Gonzales had not been an alien in 1941 at the time of conviction.

*Brancato* concerned a native of Italy who had entered the United States as an alien in 1914. Naturalized in 1929, he had returned from a foreign visit in 1930 and had been convicted of a crime in 1932. He was denaturalized in 1939. Deportation was ordered under that portion of section 19(a) of the Immigration Act of February 5, 1917, as amended (39 Stat. 889, as amended, formerly 8 U.S.C. 155(a)), which required the deportation of an alien "who is hereafter [May 1, 1917] sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude, committed within five years after the entry of the alien to the United States." The district court found that Brancato had been properly ordered deported. The district court held that the denaturalization was retroactive making Brancato an alien at the time of conviction. As an additional authority, the court cited *United States ex rel. Eichenlaub & Willumeit* v. *Shaughnessy*, 338 U.S. 521 (1950) (discussed in detail later). Upon appeal, the circuit court (one judge dissenting) reversed the district court on the ground that the law required an entry and since an entry could be made only by an alien, the law did not apply to Brancato who had entered as a citizen. Despite the denaturalization, the circuit court refused to indulge in the fiction that Brancato had been an alien at the time of entry. It went on to state that Eichenlaub was not applicable to the "general deportation statute" (Immigration Act of February 5, 1917) which the court was considering.

Passing from the cases which turn on the connection between "entry" and alienage, we come to those concerned with whether alienage must have existed when the deportation ground arose. *United States ex rel. Eichenlaub & Willumeit* v. *Shaughnessy*, 338 U.S. 521 (1950) (4-to-3 decision), concerned two aliens found to be undesirable residents of the United States whose deportation had been ordered under the Act of May 10, 1920, which in pertinent part provided:

That aliens of the following classes, in addition to those for whose expulsion from the United States provision is made in the existing law, shall [if found undesirable residents] * * * be * * * deported in the manner provided in sections 19 and 20 of the Act of February 5, 1917 * * *:

All aliens who since August 1, 1914, have been or may hereafter be convicted of any violation or conspiracy to violate * * * [The Espionage Act of June 15, 1917, as amended].

Eichenlaub, a native of Germany, became a citizen of the United States in 1936. In 1941, he was convicted for violation of the Espionage Act of 1917. In 1944, his citizenship was cancelled on the ground of fraud in its procurement. Willumeit was naturalized

527

in 1931. In 1942, he was convicted of conspiracy to violate the Espionage Act of 1917. In 1944, his naturalization was cancelled on the ground of fraud in its procurement.

The Court found the substantial issue was whether the law required the individuals involved to have been aliens at the time they were convicted. Refusing to decide whether a retroactive effect should be given to the denaturalization orders, the Court states:

* * * A simpler and equally complete solution lies in the view that the Act does not require that the offenders reached by it must have had the status of aliens at the time they were convicted. As the Act does not state that necessity, it is applicable to all such offenders, including those denaturalized before or after their convictions as well as those who never have been naturalized. The convictions of the relators for designated offenses are important conditions precedent to their being found to be undesirable residents. Their status as aliens is a necessary further condition of their deportability. When both conditions are met and, after hearing, the Attorney General finds them to be undesirable residents of the United States, the Act is satisfied.

* * * * * * *

The recognized purpose of the Act was deportation. It is difficult to imagine a reason which would have made it natural or appropriate for Congress to authorize the Attorney General to pass upon the undesirability and deportability of an alien, never naturalized, who had been convicted of espionage, but would prohibit the Attorney General from passing upon the undesirability and deportability of aliens, such as the relators in the instant cases, who had procured certificates of naturalization before their convictions of espionage, but later had been deprived of those certificates on the ground of fraud in their procurement. If there were to be a distinction made in favor of any aliens because they were at one time naturalized citizens, the logical time at which that status would be important would be the time of the *commission* of the crimes, rather than the purely fortuitous time of their *conviction* of those crimes. Not even such a distinction finds support in the statute.

The Court pointed out the failure of Congress to make a distinction between aliens who had never been naturalized and those who had lost United States citizenship was not the result of unfamiliarity with such matters.

The dissenting opinion stated that the statute permitting the deportation of an alien should be read to apply only to the person who had been an alien when convicted. It pointed out that since the statute permitted either of the two constructions without violence to language, the construction which led to hardship should be rejected. Its review of the Congressional history failed to reveal that Congress had denaturalized citizens in mind when the law was passed.

*Mangaoang* v. *Boyd*, 205 F.2d 553 (C.A. 9, 1953), cert. den. 346 U.S. 876, concerned a native of the Philippines who resided continuously in the United States from the time of his admission in 1926. He was a national of the United States from birth until 1946 when he became an alien. He had been a member of the Communist Party from 1938 to 1939. The membership was the basis for an order of

deportation under the Act of October 16, 1918, as amended by the Internal Security Act of 1950 (64 Stat. 1006, c. 1024, Title I, section 22) providing in pertinent part for the deportation of—

"Any alien who was at the time of entering the United States, or has been at any time thereafter," a member of the following class:

Aliens who are members of * * * the Communist Party of the United States (8 U.S.C. 137, 137–3(a), Supp. V, 1946 ed.).

Mangaoang, who had been a national of the United States in 1938 and 1939 when he belonged to the Party, contended that the law called for the deportation only of one who was an alien and a member of the Party simultaneously. The district court ruled that membership and alienage did not have to be coexistent. *Eichenlaub* was relied upon. The circuit court, reversing, ruled that the words "aliens who *are* members" (emphasis in original) indicated that Congress referred to persons who were at the same time both aliens and members of the Party. The court distinguished *Eichenlaub* on the ground that language there calling for the deportation of certain aliens convicted "since August 1, 1914" limited deportation only in that the conviction had to be after the date given; there was no requirement that alienage must have existed at the time of conviction.

The Government had also contended that if the law called for alienage and membership to exist simultaneously, Mangaoang was deportable, nevertheless, because he had to be considered as if he were an alien since the Philippine Independence Act of 1934 provided that for the purpose of all immigration laws, Philippine nationals "shall be considered as if they were aliens." The circuit court held that there was doubt as to whether Filipinos were to be considered as aliens under all immigration laws or only under immigration laws which existed up to the time the provisions went into effect but that if the directive applied to legislation which became effective subsequently, there was nothing in the law under which Mangaoang's deportation was sought which authorized the deportation of nationals who were to be considered aliens. Moreover, if a construction was possible which required deportation of nationals who were to be considered aliens, it would raise an ambiguity which must be resolved in favor of the alien. In deciding this issue, the court also placed reliance upon the fact that the directive had become obsolete in 1946 and no longer had any effective reference to any one. Finally, as a further reason why Mangaoang was not deportable, the court pointed out that deportation was authorized only of an alien who had made an entry into the United States and that when Mangaoang came to the United States in 1926, he had not made an entry.

529

*Resurreccion-Talavera* v. *Barber*, 231 F.2d 524 (C.A. 9, 1956), involved a person born in the Philippines. He was a national of the United States from birth to 1946 when he became an alien. He entered the United States in 1934. In 1942, he was convicted of crime. In 1952, he made several visits to Mexico. He was ordered deported under section 19 of the Immigration Act of 1917 for having been convicted of crime prior to his entry. The pertinent law provided that "any alien who was convicted * * * prior to entry, of a felony or other crime or misdemeanor involving moral turpitude; shall * * * be * * * deported." Talavera argued that this law did not apply to him because he had been a national at the time of conviction. The court sustained the order of deportation. The court stated: "that Talavera was a national of the United States and not an alien at the time of his conviction of the crime involving moral turpitude is irrelevant. * * * The statute under which Talavera was ordered deported does not include a requirement that the deportee be an alien at the time of his conviction" (p. 525).

Counsel is of the belief that the result in *Mangaoang* was different from that in *Eichenlaub* or *Talavera* because *Mangaoang* used the present tense in calling for deportation, while in the other cases (counsel alleges) deportation was called for in the past tense. It follows, therefore, counsel contends, that since in the instant case deportation is called for in the present tense, the result should be that found in *Mangaoang*, i.e., a coexistence of alienage and the coming into being of the ground of deportation.

We do not believe that counsel's contention can be sustained. In the first place, the language in *Eichenlaub* is not confined to the past tense; it calls for the deportation of aliens who "have been or may hereafter be convicted." Moreover, there is nothing in *Talavera* or *Eichenlaub* to indicate that the tense affected the courts' decision. The courts found alienage was not a necessity simply because the language did not call for alienage at the time of conviction—either an alien or a citizen could come within the language used. In *Mangaoang*, on the other hand, only an alien could comply with the language the court found controlling. That tense alone is not sufficient where the language does not eliminate all but aliens may be seen from the fact that Congress used the *past* tense in requiring the deportation of individuals for acts which could have been committed *only at a time when they were aliens*, for example, entry without inspection (section 241(a)(2), 8 U.S.C. 1251) or failure to register as an alien (the first ground set forth in section 241((a)(5) of the Act, 8 U.S.C. 1251). Surely something stronger than tense of a verb would have been used by Congress had there been the intent to exempt the convicted person who had been a naturalized citizen when the ground of deportability arose, but later became an alien.

That Congress would have resorted to definite language requiring coexistence of alienage and the creation of a ground of deportation is strengthened by an examination of the history of the law. In 1950, the Supreme Court, considering *Eichenlaub*, found that Congress, in enacting legislation to deport aliens, could not have been unaware of the fact that in the United States there were and would be aliens who became aliens because of the cancellation of their naturalization. The Supreme Court concluded that if Congress had desired to exempt a denaturalized citizen from the application of the immigration laws because he had been a citizen when the ground of deportation arose, provision to this effect would have been made. This consideration is pertinent today. The Immigration and Nationality Act of 1952 was enacted with considerable thought having been given to the cancellation of naturalization (Commentary on the Immigration and Nationality Act, pp. 86-87, Title 8, Aliens and Nationality (1953); S. Rept. No. 1515, 81st Cong., 2d Sess., pp. 754-769 (1950)). The Act was the result of the study of "each of the thousands of provisions of our immigration and naturalization laws with the end in view of appraising their adequacy, force and effect and in conjunction therewith the judicial and administrative interpretations of the provisions of the law and the rules and regulations implementing them" (S. Rept. No. 1137, 82d Cong., 2d Sess., p. 2 (1952)). The Senate version of what became the Immigration and Nationality Act contains a proposal based on the law involved in *Eichenlaub* (S. Rept. 1137, 82d Cong., 2d Sess., pp. 21-22) and the very law was incorporated in section 241(a)(17) of the Act (8 U.S.C. 1251). We cannot find that Congress was not aware of the existence of *Eichenlaub* or the problem of the denaturalized person when it enacted section 241(a)(4) of the Act. Furthermore, in connection with its study of the immigration laws, Congress had before it (S. Rept. No. 1137, 82d Cong., 2d Sess., p. 22) the following recommendation of the Special Committee to Investigate Organized Crime in Interstate Commerce:

The immigration laws should be amended to facilitate deportation of criminal and other u  sirable aliens. To this end, the committee recommends the adoption of th  egislative proposal heretofore recommended by the Commissioner of Immigration and contained in section 241 of S. 716 (82d Cong.). now pending before the Senate Judiciary Committee.[3]

Some of the criminals who occupy key positions in criminal gangs and syndicates are alien-born. Some came into this country illegally. Some have

---

[3] See testimony of the Commissioner before the Committee on March 26. 1951 (S. Rept. No. 307, 82d Cong., 1st Sess., p. 579) discussing grounds of deportation similar to those found in section 241(a) of the Act and the additional proposal for the deportation of aliens who at any time after entry were convicted of crime and declared to be undesirable by the Attorney General.

never been naturalized. Others obtained naturalization certificates by concealing their criminal activities. (S. Rept. No. 307, 82d Cong., 1st Sess., p. 15)

It appears to us that this is some indication that Congress desired that a naturalized person whose naturalization was revoked should be made the subject of deportation proceedings, and that the deportation of alien criminal elements be facilitated whether or not they had been naturalized.

Counsel, relying upon the characterization of *Eichenlaub* in *Brancato*, contends that *Eichenlaub* is not applicable. In *Brancato* the court said that *Eichenlaub* did not apply to the "general deportation statute." This statement is dicta for the case had already been decided on the theory that an entry was required and Brancato had made no entry since he had entered as a United States citizen. With due deference to the dicta of the circuit court, we would point out that the majority opinion in *Eichenlaub* made no attempt to distinguish the Act of 1920 involved from the general deportation statute and that Mr. Justice Frankfurter (joined in his dissenting opinion by two other Justices) was of the belief that "The court's decision has serious implications with respect to citizens denaturalized for reasons not involving moral blame, and who have, while citizens, committed one of a variety of acts not involving moral obliquity and certainly not endangering the security of the country but which nevertheless are covered by other statutory provisions in language similar to that before us." He gave as an example a provision of the general deportation statute which provided for the deportation of an alien convicted for violation of a narcotic law. Moreover, *Eichenlaub* has generally in both administrative and judicial opinions been considered as applying to the general deportation law (*e.g.*, *Marks* v. *Esperdy*, 198 F. Supp. 40 (S.D. N.Y., 1961), and *Matters of P—*, 4—373).

Furthermore, it is most telling that Congress which presumably knew of *Eichenlaub* placed the ground of deportation involved there in the general deportation statute in 1952 when it was made a part of section 241(a)(17) of the Act (8 U.S.C. 1251) and provision also was made for the deportation of aliens who violate current provisions of the 1920 Act found in 18 U.S.C. 791–794, 2388, and 3241. For what it may be worth, we must point out that *Mangaoang*, upon which counsel places much reliance, also did not concern the general deportation law (Immigration Act of February 5, 1917); it involved a special law relating to the exclusion and expulsion of subversives (Act of October 16, 1918, 40 Stat. 1012, as finally amended by the Act of September 23, 1950 (64 Stat. 987). Lastly, it must be stated that *Talavera* involved the *general immigration* statute.

Counsel contends that it is improper to apply section 241(a)(4) of the Act to one who was convicted while he was a citizen because such application makes ineffective the provisions of section 241(b) of the Act which permit a court to make a recommendation against deportation within 30 days of passing sentence. Counsel relies upon *Gubbels* v. *Hoy*, 261 F.2d 952 (C.C.A. 9, 1958). *Gubbels* involved the question as to whether a conviction of a military court could be a basis for deportability. The court held that since a military court could not make a recommendation against deportation, Congress had not intended to make its sentence the basis for deportation. The issue was the nature of the tribunal whose judgment Congress intended to be the basis for deportation. Such is not the issue here, where, as the special inquiry officer has pointed out, it was not the nature of the tribunal but the respondent's misconduct in obtaining naturalization improperly which prevented him from obtaining a recommendation against deportation. (Actually, the question of making a recommendation could have been raised by the respondent who had been fighting efforts of the Government to denaturalize him since at least October 1952 (Exh. 5, p. 2).)

Moreover, the fact that an alien has not had an opportunity to petition the court for a recommendation against deportation does not prevent his deportation for conviction of crime under a law which does provide for such recommendation. The right of the nation to expel aliens is absolute and unqualified (*United States ex rel. Circella* v. *Neelly*, 115 F. Supp. 615, 626 (N.D. Ill., 1953), aff'd *sub nom United States ex rel. Circella* v. *Sahli*, 216 F.2d 33 (C.A. 7, 1954), cert. den. 348 U.S. 964; and *Matter of L—*, 8—389, 390). See, *United States ex rel. Klonis* v. *Davis*, 13 F.2d 630 (C.A. 2, 1926); *Todaro* v. *Munster*, 62 F.2d 963 (C.A. 10, 1933); and *Matter of Y—M—*, 8—94. Moreover, the provisions calling for the deportation of convicted aliens and the making of recommendations against deportation have been in effect since 1917. Filipinos convicted between 1917 and at least 1934 were nationals of the United States to whom the immigration laws did not apply. Yet, in 1934 Congress had no hesitancy in providing for the application of the immigration laws, including the 1917 Act, to Filipinos for acts which had occurred (and until 1946 would occur) while they were nationals (see *Mesina* v. *Rosenberg*, 278 F.2d 291, 296–297 (C.A. 9, 1960)). Finally, there is still available to the respondent the benefits of that portion of section 241(b) which prevents deportation of one who has obtained a pardon.

Several administrative decisions are pertinent to the issue as to the necessity of the coexistence of alienage and the conviction. *Matter of L—*, 6—666 (1955), concerned an individual who had entered the United States as an alien in 1926. He became a United

States citizen in 1931. He was convicted of four crimes in 1940. In 1950, he lost United States citizenship under section 401(g) of the Nationality Act of 1940 which provided for the expatriation of a dishonorably discharged citizen who in time of war had been convicted by court martial of desertion. Deportation proceedings were brought under section 241(a)(4) of the Act charging L— with having committed two crimes after entry. The Board sustained the order of deportation. Subsequently, the Supreme Court ruled that section 401(g) of the Nationality Act of 1940 was unconstitutional (*Trop* v. *Dulles*, 356 U.S. 86) and because of this, on September 11, 1958, the Board withdrew its order of 1955 and terminated proceedings. Counsel in a supplemental brief presents the belief that the Board's order in 1955 was in error. He is of the belief the issue was given little consideration; that expatriation presents a different situation from a cancellation of naturalization; and that *Mangaoang* was distinguished administratively merely on the grounds relating to entry, ignoring the additional ground concerning the coexistence of alienage and the ground of deportability. We do not believe our decision was in error. The issue was appropriately considered and decided on the basis of precedents, including *Eichenlaub*.

*Matter of S—*, 5—678 (1954), concerned a person who while a citizen of the United States had been convicted of theft on three occasions. Subsequently, he lost his United States citizenship by taking an oath of allegiance to a foreign government. When he attempted to return to the United States, he was excluded under the Immigration and Nationality Act as one who had been convicted of crime involving moral turpitude prior to entry. The alien contended that at the time the offenses were committed he was not an alien but a citizen and was not excludable because he had never been convicted of a crime as an alien. The Board held that the contention was without merit because the Act required the exclusion of persons who were aliens without excepting those who had been citizens and suffered expatriation. *Eichenlaub* was relied upon and *Mangaoang* was distinguished by reference to its third numbered paragraph. This paragraph points out that *Mangaoang* differs from *Eichenlaub* because in *Eichenlaub* the language "did not require a showing that at the time of conviction * * * the person in question had then been an alien" while in *Mangaoang* the language did require the person to be an alien. Counsel contends that S— was found excludable "because of the past-tense language of the statute involved" and that *Mangaoang* "was distinguished as being based on a present-tense statute similar to section 241(a)(4)." We find no mention of tense as a reason for ordering S—'s deportation. The convictions in *Matter of S—* could have happened to either an

alien or a nonalien, and the law did not limit deportability to those who had been convicted only as aliens. This was the basis of the decision. The same basis for decision was used in *Matter of M—*, A–11875663, 9—452 (1961), which involved a native-born citizen of the United States who had been convicted of a crime in 1951. He expatriated himself in 1959 by service in the armed forces of a foreign state. He last entered in 1960. His deportation was ordered under the Act as one who had been excludable in 1960 as an alien convicted of crime prior to entry.

*Matter of P—*, 4—373 (1951), and *Matter of W—*, 5—759, 764 (1954), involved persons who entered as United States citizens and were ordered deported for having been convicted of crime, or having admitted commission of crime prior to last entry. Counsel is of the belief that deportation was ordered because the past tense was used in the laws. In these cases, decided before *Brancato*, the Board's decision was not based upon the tense of the statute involved but upon the fact that denaturalization stripped the individual of United States citizenship retroactively. There is no basis for concluding that the Board would have acted differently had the statutory language been written *in praesenti*.

Counsel contends that to find it possible to interpret section 241(a)(4) to make the coexistence of alienage and conviction unnecessary would make the statute ambiguous so that a construction favorable to the respondent should be taken. The rule of the cases, however, is clear. When the law requires deportation for acts which can be performed or happen to either an alien or a citizen, nationality status at the time of the performance or happening is immaterial unless the law provides that alienage must be present. There is thus no ambiguity. Applying the rule to the language of section 241(a)(4), we find that the act condemned—conviction—can occur to either a citizen or an alien and the law does not provide that the subject be an alien. Therefore, alienage at the time of conviction was not a necessity [4] and the charge is sustained if moral turpitude is involved and the crimes did not arise out of a single scheme of criminal misconduct.

### Single Scheme

Counsel contends that the Service has failed to prove that the two convictions on which the order of deportation is based did not arise "out of a single scheme of criminal misconduct." The respondent had been indicted for filing false and fraudulent income tax

---

[4] So that all major aspects of the case may be properly developed for judicial review, if it should take place, we shall subsequently discuss the issue as to whether the respondent must not be considered to have been an alien at the time of conviction.

returns for 1946, 1947, 1948 and 1949. The jury convicted the respondent for the years 1947, 1948 and 1949. He was sentenced to 5 years on each count, to run concurrently, and a fine was imposed. On appeal, the conviction as to 1947 was reversed.

At the deportation hearing, the respondent refused to testify. The Service presented the record of the convictions, showing in one count a violation of the law by the filing of a fraudulent return on January 14, 1949, for the calendar year 1948, and in the other count, a fraudulent filing of a tax return on March 10, 1950, for the year 1949. The Service then rested. In his defense, the respondent presented the summation of the prosecuting attorney at the tax evasion trial as evidence that the convictions arose out of a single scheme (Exh. 15). The summation reveals that the Government's case is built upon the net worth theory. Proof was made of the respondent's assets in 1946, the amount of income he reported for the years 1946 to 1949, the fact that he had spent twice the money he had reported as income for those years, and the fact that there was a source from which the additional income could have come to the respondent. The sums spent over and above that which could be attributed to the assets started with and income reported were alleged to be income concealed. The brief of the respondent sets forth several instances where the prosecuting attorney, in his summation, made the point that the respondent had so conducted himself over a period of years that he had spent twice as much as he had reported, defrauding the Government of taxes due. Great emphasis is put on this statement of the prosecuting attorney. "If the F—C—s can get away with this scheme to defeat and defraud the Government out of income taxes, then the honest taxpayers of this country * * * will carry the load * * * (p. 1834, Exh. 4). The respondent also submitted a subpoena for F—, an attorney, who had represented the respondent at the trial on income tax evasion. It was alleged that although not a participant, the witness allegedly had knowelge of the facts which would show a single scheme. Counsel explained that the request to subpoena F— came after the death of D—, another of the respondent's attorneys at the tax evasion trial and one who had agreed to testify. The request was denied. Counsel then requested (and received) permission to submit affidavits from F— and another person. However, affidavits were not submitted. The Government presented the summation of the defense counsel at the tax evasion trial (Exh. 17), an affidavit of C—'s in support of a motion for inspection of minutes of the grand jury (Exh. 18), and testimony of S—, a defense witness at the tax evasion trial (Exh. 19).

The special inquiry officer ruled that the burden of proving that the convictions had not arisen from a single scheme was upon the

Government and that in the absence of probative evidence to the the contrary, a record of conviction failing to show acts in furtherance of a common plan would suffice to establish a single scheme did not exist. The special inquiry officer, relying heavily on *Chanan Din Khan v. Barber*, 147 F. Supp. 771 (N.D. Calif.), aff'd 253 F.2d 547 (C.A. 9, 1958), cert. den. 357 U.S. 920, where the facts are similar to those in the instant case, found that a single scheme had not existed.

Counsel contends the Service cannot bear its burden of establishing that the respondent's crimes did not arise out of a single scheme by merely introducing a conviction in the situation before us because there is nothing in the two successive tax evasions which negates singleness of scheme. Counsel contends the Service is under the obligation of making further proof that a single scheme was not involved. Counsel contends that *Chanan Din Khan v. Barber*, *supra*, is wrong because it was decided in the belief that the burden of proof as to the single scheme issue was on the alien rather than on the Service, and because the term "single scheme" was equated with a single punishable crime. Counsel contends that these tests were rejected in *Wood v. Hoy*, 266 F.2d 825 (C.A. 9, 1959).

*Chanan Din Khan* was reviewed in *Wood v. Hoy, supra*, and quoted from, without criticism. It is, therefore, guiding authority for a situation such as was involved there. *Chanan Din Khan*, on facts very similar to those before us, held that an indictment showing convictions on two fraudulent returns filed a year apart is persuasive evidence that two unrelated crimes were involved. In the instant case, there is no probative evidence controverting the inference which flows from the commission of crimes a year apart. Certainly, the remarks of the prosecuting attorney at the tax evasion trial do not controvert the inference which flows from the convictions. The prosecuting attorney was concerned with the concealment of income from the Government to avoid payment of taxes. He did not have to prove that when the respondent took the first step to defraud the Government that he intended to continue to do so for the next three years. The word "scheme" could have been applied to actions and plans which had as their end the filing of a fraudulent tax return if only one year had been involved. It was unnecessary for the prosecuting attorney to establish that there was a *scheme* to commit both violations in order to obtain a conviction. Moreover, even if this ambiguous opinion by the prosecuting attorney, made in the heat of advocacy, referred to a conspiracy for the four years, it would not be controlling as to the actual state of mind of the respondent. In fact, if the opinion of the prosecuting attorney were meant to express the belief that when the respondent filed his return for 1946 he conspired to defraud the Government

in the next three years, it was an opinion not shared by the jury which acquitted the respondent on the charge involving the year 1946.

Counsel sites *Matter of F—G— & C—D—*, 8—447, in support of his contention that the convictions in the instant case arose out of a single scheme. In the administrative decision cited, the first alien had been convicted on two counts of making a false statement for the purpose of obtaining unemployment insurance benefits. In count one he was charged with making the first false statement and in count two with making the second false statement a week later. The Board decided that it was proper to conclude that when the alien falsely represented he was unemployed to obtain benefits, he intended to do it again on the following week, although the inference might be too broad if attempt were made to extend it to the entire 26 weeks of benefits. In the instant case, it would be even less proper to infer that the intention to falsify the return filed in March 1950 was formed in January 1949 when the prior fraudulent return was filed (*Chanan Din Khan* v. *Barber, supra*).

Counsel contends that the net worth theory by its very nature prevents a showing that two crimes did not arise out of a single scheme. This contention is based on the belief that under the net worth theory convictions for two successive years are possible upon proof of facts which show no more than that the indicted person received a sum of money in one year and spent it in two successive years without reporting what was spent as income in either year. In other words, the possibility is raised that in January 1949, the respondent evaded the payment of taxes then due on income which he had received in 1948 and that, although in March 1950 he filed a return showing some income in 1949, it could have been from the same income concealed in 1948 that the money came which was spent in 1949 in excess of that reported. It is answer enough that there is no proof that the convictions for 1948 and 1949 were the result of a conspiracy to evade payment of taxes for income which had been received only in 1948. On the contrary, the record of that trial reveals there was income for both 1948 and 1949 (Exh. 19, pp. 1679(a)–1681(a)). Moreover, an examination of the reported tax conviction case reveals the following pertinent charge to the jury:

This [net worth] method involves determination of the defendant's net worth at the beginning and end of a period in order to foreclose the possibility that the expenditures were made, or the net worth increases were derived, from prior accumulated funds.

\* \* \* \* \* \* \*

In order for you to find that sums received by the defendant during any of the taxable years constituted income to him, it is not necessary for the Government to have proved the exact source of the income. None of the alleged excess investments and expenditures made by the C—s during any

year shall be considered in determining the taxable income of the defendant F—C— in any year unless you find that there was an excess of expenditures and investments, and that it constituted money which the defendant received as taxable income during the year in which the money was spent. (*United States* v. *Costello*, 221 F.2d 668, 676 (C.A. 2), aff'd 350 U.S. 359)

The net worth theory is a method for proving that a crime was committed during a particular year. Its use does not negate the possibility that the crimes were the results of independent violations made from year to year rather than at one time in a particular year.

## Moral Turpitude

We come now to the question of whether the special inquiry officer properly found that the respondent's convictions on two counts for violation of 26 U.S.C. 145(b) involve moral turpitude. The special inquiry officer, relying upon judicial precedents, found that fraud was an ingredient and that moral turpitude was present. The issue was fully discussed by the special inquiry officer. Counsel contends that *United States* v. *Scharton*, 285 U.S. 518 (1932), and *United States* v. *Carrollo*, 30 F. Supp. 3 (W.D. Mo., 1939), require a contrary finding. Similar contention based upon the cases cited by counsel was made in *Chanan Din Khan* v. *Barber*, 147 F. Supp. 771, 775 (N.D. Calif., 1957), which concerned violations of the same section involved in the instant case. The court found that moral turpitude was present. The decision of the court was affirmed upon appeal, 253 F.2d 547, and certiorari was denied, 357 U.S. 920. We see no need to discuss this issue further.

We find no reversible error in the denial for the issuance of a subpoena for F—. The issuance of a subpoena is a discretionary matter. While the respondent was entitled to produce evidence in such form as he desired, there was no abuse of discretion in denying the subpoena in the absence of some more specific statement as to the testimony which the witness could offer.

The respondent's deportability is established on the first charge because of convictions for evasion of taxes.

## Relation-Back Theory

Our conclusion is that alienage and conviction need not be co-existent; however, as we previously indicated, we shall consider the issue as to whether the respondent should be regarded as having been an alien at the time of the conviction since he has been denaturalized under section 340(a) of the Act (8 U.S.C. 1451). The section provides that revocation "shall be effective as of the original date of the order and certificate." The special inquiry officer found the law to be that denaturalization is retroactive and confers upon

the subject the status of an alien at all times and for all purposes, except that one who entered while naturalized may not be considered as having entered as an alien, and except that certain language providing for the deportation of an alien who is a member of a proscribed organization requires that there must be a coexistence of alienage and membership. The special inquiry officer ruled that since C— fell in neither of the exceptions, he must be considered as having been an alien at the time of the conviction. Counsel contends that the "relation-back" theory should not be applied because judicial precedents require that a denaturalized person be regarded as if he had been a citizen before the denaturalization even though he was not lawfully entitled to be naturalized. We believe that the "relation-back" theory is properly applied here.

Prior to the Immigration and Nationality Act, it was established that a revocation of naturalization, whether for fraud or for illegality, was retroactive (*United States ex rel. Brancato v. Lehmann, supra*). While there was general agreement that the denaturalized person must be considered as an alien from the time of the denaturalization, the rule of the cases appears to have been that the fiction that alienage existed at any particular moment in the past would not be indulged in if the individual would be required to do what was impossible of performance. Thus, the fiction was not indulged in where it would require an individual who entered as a United States citizen to have been in possession of the documents required of an alien (*Matter of C—*, 3—275 (Atty. Gen., 1950)). In the same vein, it was improper to consider one who did something as a national of the United States, as if he had done it while an alien (*Barber v. Gonzales, supra*). However, the relation-back doctrine was applied where it did not require the "impossible" of the alien (*Matter of P—*, 4—373).

Although it is the contention of counsel that it is improper to apply section 340(a) to a deportation section, we see nothing in the working or the history of this law (which at the minimum merely restates what was decided judicially) that would prevent its application to deportation proceedings. The section can be given effect in the case before us without violence to precedents if we consider the respondent as an alien at the time he was convicted. The commission of crime or the conviction was not related to nationality. To consider the respondent as having been an alien at the time of the conviction imputes to him no action which he, as a citizen, could not have done. No impossibility is asked for. We believe it is proper for the purposes of section 241(a)(4) of the Act to consider the respondent as having been an alien at the time of his conviction. (Cf. *Mesina v. Rosenberg*, 278 F.2d 291 (C.A. 9, 1960).)

540

Counsel contends that Congress could not have intended the relation-back theory to apply because in section 241(b) provision was made for a recommendation against deportation, a provision which would be of use only to an alien. This contention has been previously considered; we pointed out that Congress has the power to deport an alien who had no access to a recommendation against deportation. Congress must have realized that the 30-day period within which such a recommendation could be made would have passed by the time of the denaturalization, and may have been content to permit the denaturalized person to resort to a pardon.

At oral argument, counsel expressed the belief that the special inquiry officer had used *Eichenlaub* as authority to give a retroactive effect to alienage (p. 4 of oral argument). Although the special inquiry officer gave a retroactive effect to the denaturalization, he did not use *Eichenlaub* as authority for this. (See last sentence on p. 15 of the special inquiry officer's opinion.) The special inquiry officer relied upon the statutory declaration in section 340(a) of the Immigration and Nationality Act (p. 18 of special inquiry officer's opinion).

The special inquiry officer found the respondent deportable on the first charge. The first charge is superfluous; it is contained within the third. The record does not establish the respondent's deportability on the second charge for the reason stated by the special inquiry officer. The respondent's deportability on the third charge is sustained, based on the tax evasion convictions; deportability on the basis of the other convictions has not been established.

The findings of fact and conclusions of law of the special inquiry officer are adopted except Conclusion of Law No. 3 will be amended to eliminate the convictions in 1954 for tax evasion as grounds on which the respondent is not deportable:

(3) That you are not deportable under section 241(a)(4) of the Immigration and Nationality Act based on conviction for two crimes after entry (contempt of Congress in 1952; contempt of court in 1957).

**ORDER:** It is ordered that the appeal be dismissed.

*It is further ordered* that the respondent be deported from the United States in the manner provided by law on the third charge of deportability based solely on the income tax convictions.